**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ANGELA LYNN BUTLER
                                CASE NO. 20-CV-10836

      *Plaintiff*,
                                  HON. DENISE PAGE HOOD
*v*.
                                  DISTRICT JUDGE

COMMISSIONER OF
                                  HON. PATRICIA T. MORRIS
SOCIAL SECURITY,
                                  MAGISTRATE JUDGE

      *Defendant*.
_____/

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11,14)**</u>

## I.    **RECOMMENDATION**

Plaintiff Angela Butler challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 11), **GRANTING** the Commissioner's motion, (ECF No. 14), and affirming the decision.

## II.    **REPORT**

### A. Introduction and Procedural History

Plaintiff's application for DIB was completed on April 12, 2017. (ECF No. 9-5, PageID.175.) She alleged she became disabled on February 23, 2016. (*Id*. at PageID.177.)

The Commissioner denied the claim on September 15, 2017. (ECF No. 9-4, PageID.129.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on August 14, 2018. (ECF No. 9-4, PageID.135; ECF No. 9-2, PageID.75.) The ALJ issued a decision on December 31, 2018, finding that Plaintiff was not disabled. (ECF No. 9-2, PageID.57.) The Appeals Council denied review on February 12, 2020. (ECF No. 9-2, PageID.41.) Plaintiff sought judicial review on March 3, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 11, 14.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 9-2.) At step one, the ALJ found Plaintiff met the insured status requirements through June 30, 2021 and had not engaged in substantial gainful activity since the alleged onset date of February 23, 2016. (*Id*. at PageID.62.) At step two, the ALJ

concluded that Plaintiff had the following severe impairments: spine disorder, obesity, and asthma. (*Id*. at PageID.63.) The ALJ also found that Plaintiff had the following non-severe impairments: hypertension, gastroesophageal reflux disease (GERD), irritable bowl syndrome, and peripheral neuropathy. (*Id*. at PageID.63-64.) These impairments did not meet or medically equal a listed impairment at step three. (*Id.* at PageID.64.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally stoop, kneel, crawl, and crouch, and must avoid exposure to unprotected heights, hazardous machinery, and must avoid balancing on narrow, slippery, or moving surfaces. The claimant requires a clean-air environment and must avoid extreme heat, and requires low levels of humidity and requires low levels of pulmonary irritants such as fumes, odors, dusts, gases, such as those found in an office environment. Finally, the claimant requires a sit/stand option to alternate between sitting and standing every 15 minutes.

(*Id*. at PageID.65.) At step four, the ALJ found Plaintiff had no past relevant work. (*Id.* at PageID.69.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including reception clerk, office clerk, and protective service worker. (*Id.* at PageID.69-70.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.70.)

### E.  Administrative Record

#### i.      Plaintiff's Testimony at the Administrative Hearing

At the time of the hearing, Plaintiff was 42 years old. (ECF No. 9-2, PageID.81.) Plaintiff testified that she completed high school, had a driver's license, and drove every day. (*Id*. at PageID.81-82.) She lived with her 20-year-old daughter. (*Id*. at PageID.82.)

With money that she received from "workman's comp," Plaintiff purchased a tanning salon that her daughter and cousin operated. (*Id.* at PageID.83.) As the owner of the salon, Plaintiff "[paid] the bills" and visited the salon every day, but her daughter "takes care of the business there." (*Id.*) Plaintiff used the earnings from the salon to pay her daughter and cousin, pay rent for the salon, purchases "tanning balls" and lotions, and uses the leftover to pay her "bills at home." (*Id.*) Plaintiff estimated that she took home about $500-$600 from the salon that she used to pay her bills. (*Id.* at PageID.84.) She usually stayed at the salon for about one hour. (*Id.*)

The ALJ asked Plaintiff about her prior work. Plaintiff worked at Target for 17 years, always part-time. (*Id.* at PageID.85.) She also worked part-time at Joe Louis Arena. (*Id.*) Plaintiff also testified that until 2010 or 2011 she worked with her stepmother, on a part-time basis, who owned a wedding business, where Plaintiff helped with decorations. (*Id.* at PageID.86.)

Next, the ALJ asked Plaintiff what conditions rendered her unable to work full-time. (*Id.* at PageID.86-87.) Plaintiff responded: "I have a pinched nerve, [] I need a lumbar fusion. I have high anxiety, and I have vasovagal syncope to where when I'm in a lot of pain, or my anxiety is high, I just pass out." (*Id.* at PageID.87.) She was planning for the lumbar fusion surgery with her doctor but needed to wait until "it gets to the point where I can't walk all the way" and until she lost weight. (*Id.*) At the time she was using Motrin, Extra Strength Tylenol, and Tramadol for the pain. (*Id.*) Plaintiff had previously been in physical therapy but was released as it "was causing more damage after [her] surgery." (*Id.* at PageID.88.) In March 2016, her pain was "resolved," and she went back to work, but

then she began experiencing pain in her back and leg again. (*Id*. at PageID.89.) Plaintiff's doctor told her that the pain was caused by her sciatic nerve. (*Id*.)

When asked about her anxiety, Plaintiff testified that she saw a neurologist but did not seek other treatment. (*Id*. at PageID.89-90.) She tried a few different medications but did not like the side effects so stopped taking them. (*Id*. at PageID.90.) Her neurologist recommended that she start attending counseling of some sort, such as individual or group therapy. (*Id*. at PageID.90-91.) Due to her vasovagal syncope, when Plaintiff feels anxious or stressed out, she will pass out, and testified that this can happen "three times a month, or it can happen once a week. It's – it varies." (*Id*. at PageID.89.)

Plaintiff testified that she experiences numbness or neuropathy in her right leg and right buttock "every single day." (*Id*. at PageID.91.)

Plaintiff described her day-to-day routine. (*Id*. at PageID.92.) She does the laundry but has her daughter lift the laundry basket for her. She washes dishes by hand without a dishwasher. She goes to the tanning salon to visit with her daughter and she usually takes a nap. (*Id*. at PageID.92.) In terms of hobbies, she goes to the movies. (*Id*.) At home, she watches television and uses her phone to play games and text or call others. (*Id*. at PageID.92-93.) She estimated that she could walk a city block without stopping and could stand up for about 10 minutes before needing to sit or walk around. (*Id*. at PageID.93.) She testified that she could sit for about 10 to 15 minutes and could lift "a milk jug or a water jug," but could not lift a 24 pack of water bottles or a bag of cat litter. (*Id*. at PageID.93-94.)

### ii.   The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ questioned the vocational expert (VE). (*Id*. at PageID.104.) The ALJ, after noting that there was no relevant work history to consider past work, asked the VE to consider a hypothetical individual of Plaintiff's age and education who was capable of sedentary work and could:

> occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. They can occasionally stoop, kneel, crawl, and crouch. They must avoid exposure to unprotected heights and hazardous machinery, and they must avoid balancing on narrow, slippery, or moving surfaces.

(*Id*.) The ALJ asked whether there would be any suitable work for such an individual. The VE testified that "some jobs would meet those criteria[,]" including reception and information clerk, DOT code 237.367-014, SVP 2, 60,000 jobs; office clerk, DOT code 209.587-010, SVP 2, 50,000 jobs; and protective service worker, DOT code 379.367-010, SVP 2, 10,000 jobs. (*Id*.)

The ALJ then asked the VE to consider an individual with the same restrictions as previously discussed, but who also "required a clean air environment" and "must avoid extreme heat." (*Id*. at PageID.105.) This individual would require "low levels of humidity and low levels of pulmonary irritants such as fumes, odors, dust, gasses, such as that found in an office environment[.]" (*Id*.) When asked if these additional limitations would effect the individual's ability to perform the aforementioned jobs, the VE responded "no." (*Id*.)

The ALJ then asked the VE if the same jobs would be available to the same individual, but who required, in addition, "an option to alternate between sitting and

standing every 15 minutes[.]" (*Id.*) The VE responded that some of the available jobs would be reduced; for instance, there would be 45,000 reception and information clerk jobs, 30,000 office clerk jobs, and 7,500 protective service worker jobs. (*Id.*)

Finally, the ALJ asked about an individual who could "perform simple, routine tasks, but could not tolerate demanding work pressures, such as high-volume output, very short deadlines or high levels of precision. They can make simple, work-related decision and adapt to occasional changes in the routine work setting[.]" (*Id.*) The VE responded that such an individual could still perform the suggested jobs. (*Id.*)

The VE testified that her testimony was consistent with Dictionary of Occupational Titles (DOT) with the exception that topics such as the sit-stand option and the clean air were based on her professional experience "placing people in jobs." (*Id.* at PageID.105-106.)

Plaintiff's attorney asked the VE whether being off-task 15% or more would affect the jobs outlined. (*Id.* at PageID.106.) The VE responded that "if it would exceed 15% at all, it would become preclusive." (*Id.*) Plaintiff's attorney then asked about missing two or more days on a regular or consistent basis, and the VE responded that that would also be preclusive. (*Id.*)

## F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017,

distinguish between acceptable medical sources, medical sources and nonmedical sources.

An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

      (i)      A licensed or certified psychologist at the independent practice level; or

      (ii)     A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a

medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)    Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

15

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can

reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account...We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

     (iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

     (v)     Treatment, other than medication, . . . received for relief of . . . pain;

     (vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

     (1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

     (2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

     (3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

     (4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

     (5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G. Arguments and Analysis

### i.    Pace's Opinion

Plaintiff first argues that the ALJ failed to properly articulate how persuasive she found the medical opinion of Kimberly Pace, an occupational therapist. (ECF No. 11, PageID.1010-11.) Plaintiff takes issue with the ALJ's statement that Pace's opinion was not an acceptable medical source, as an occupational therapist. Then, Plaintiff argues that even if the ALJ provided additional reasoning for not relying on Pace's opinion, it was "not clear to what extent her mistaken belief that Pace was not an AMS factored into her conclusion[.]" (ECF No. 11, PageID.1013.)

In contrast, Defendant argues that the ALJ reasonably found Pace's opinion unpersuasive because it was not supported by or consistent with the record—Defendant argues that the most important factor of those considered by the ALJ is "supportability." (ECF No. 14, PageID.1034.)

Regarding Pace's opinion, the ALJ wrote, "[t]he undersigned notes that Mrs. Pace is not an acceptable medical source" and "[s]tatements not from acceptable medical sources are considered to be 'other sources,' but their statements are not considered 'opinions.'" (ECF No. 9-2, PageID.68.) The ALJ went on to articulate, "[h]owever, the undersigned finds the opinions of Mrs. Pace to be unpersuasive as they are not supported and are inconsistent with the medical evidence of record that shows the claimant to have 5/5 strength with her sensations intact." (*Id*.) The ALJ further distinguished Pace's opinion from the medical evidence, writing, "[h]er coordination was normal as was her gait. Her reflexes were normal in all extremities (Exhibit 13F/9). Her gait was noted to be normal

and her muscle strength was 5/5 and her range of motion was full in her hips, knees and ankles (Exhibit 8F/6)." (*Id*.)

Plaintiff argues that Pace is a "medical source" per the Regulations who "is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law," citing 20 C.F.R. § 404.1502(d). (ECF No. 11, PageID.1011-12.) Plaintiff argues that "[w]hile the Administration still distinguishes between 'acceptable' medical sources and 'non-acceptable' medical sources, this distinction does not indicate that opinions from acceptable medical sources are more inherently valuable than opinions from 'other' medical sources." (*Id*. at PageID.1012.) Plaintiff argues that the ALJ is no longer required to articulate how they considered opinions from non-*medical* sources, but that Pace's opinion was indeed a medical opinion, even if it was a non-*acceptable* medical opinion. (*Id*. at PageID.1012-1013.) Defendant concedes that "the ALJ incorrectly asserted that Ms. Pace's report was not an 'opinion,' (PageID.68)," but argues that "the misstatement was harmless because the ALJ still did exactly what she was supposed to do—she considered Ms. Pace's opinion and explained how persuasive she found it based on its supportability and consistency." (ECF No. 14, PageID.1035.)

Indeed, this court has previously found, and the Regulations seem clear, that "occupational therapists are not considered acceptable medical sources, so their opinions are not entitled to significant weight. 20 C.F.R. § 404.1502(a); 20 C.F.R. § 416.902(a)." *Shahin v. Saul*, No. 18-cv-12939, 2020 WL 38931 at *5 (E.D. Mich. Jan. 3, 2020). Defendant concedes that Pace's opinion was an "opinion," although it was a non-acceptable medical source. *Id*.

21

As such, the ALJ was required to analyze Pace's opinion as a medical opinion, albeit a non-acceptable one, and needed to consider several factors when she contemplated "the medical opinion(s) and prior administrative medical findings[.]" 20 C.F.R. § 404.1502(a). Of these factors, discussed thoroughly above, "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2).

In her reply to Defendant's Motion, Plaintiff expounds on her argument that the ALJ erred by mischaracterizing Pace's opinion. (ECF No. 15, PageID.1046.) Plaintiff argues that "[a]t issue is Pace's conclusion that [Plaintiff] would only be capable of lifting 5-10 pounds rarely, and 0-5 pounds occasionally in a work setting[.]" (*Id.* at PageID.1047.) Plaintiff points out that "the regulations indicate that sedentary work involves '[] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." (*Id.*) (citing 20 C.F.R. 404.1567(a).) Plaintiff argues that Pace's opinion suggested Plaintiff should lift less than the maximum allowed by the regulation-defined sedentary work. (*Id.* at PageID.1048.) Thus, Plaintiff argues, the ALJ erred by failing to consider Pace's recommendation regarding how much weight Plaintiff can lift and for how long. (*Id.*)

I conclude that this error does not require reversal or remand and was ultimately harmless because the ALJ properly considered the supportability and consistency of Pace's opinion. Specifically, the ALJ held that Pace's opinion was "not supported and [was] inconsistent with the medical evidence of record that shows the claimant to have 5/5

strength with her sensations intact," and explained, "[h]er coordination was normal as was her gait. Her reflexes were normal in all extremities (Exhibit 13F/9). Her gait was noted to be normal and her muscle strength was 5/5 and her range of motion was full in her hips, knees and ankles (Exhibit 8F/6)." (ECF No 9-2, PageID.68.) The ALJ described the differences between Pace's opinion and the medical evidence upon which she relied, which indeed went against Pace's opinion: Pace wrote that Plaintiff had a decreased range of motion in her hips (ECF No. 9-8, PageID.591) and had a "slow, antalgic" gait. (*Id.* at PageID.595), for example. Indeed, Pace recommended that Plaintiff could function at a "less than sedentary" physical demand level (ECF No. 9-8, PageID.591), as Plaintiff argues; but a report by Jefferey Rosenberg, M.D., who had seen Plaintiff several times from 2014 to 2016, noted that "A Work Restrictions [sic] was written. No bending, pushing, pulling, twisting or lifting *over ten pounds*." (ECF No. 9-7, PageID.498) (emphasis added.) This report was dated in 2014 and in 2016, a report by Dr. Rosenberg again noted the "work restrictions." (*Id.* at PageID.476.) Given that the ALJ found Pace's opinion to be unsupported by other areas of medical evidence, I suggest that the ALJ did not err by also finding, with support from evidence in the record such as Dr. Rosenberg's report, that Plaintiff could lift up to 10 pounds as consistent with the definitions for sedentary work, and not between 0-5 pounds and Pace recommended and Plaintiff now argues.

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citation omitted). Since the ALJ's

decision is supported by substantial evidence, I suggest that Plaintiff's argument on this point fails.

### ii.  ALJ Acknowledgment of Vasovagal Syncope in RFC

Second, Plaintiff argues that the ALJ failed to explain how she considered any limitations arising from Plaintiff's vasovagal syncope.[1] (ECF No. 11, PageID.1017-18.) In contrast, Defendant argues that substantial evidence supports finding that, even considering Plaintiff's vasovagal syncope, Plaintiff could perform limited sedentary work. Defendant also argues that Plaintiff didn't seek therapy or treatment for her anxiety, which triggers her vasovagal syncope. (ECF No. 14, PageID.1029-30.)

Plaintiff concedes that the ALJ's failure to consider her vasovagal syncope a severe impairment "is not necessarily an error." (ECF No. 11, PageID.1018.) Plaintiff takes issue with the fact that the ALJ did not "acknowledge or discuss any potential limitations" airing from it when assessing Plaintiff's overall RFC. (*Id*.) Defendant argues that the ALJ acknowledged Plaintiff's testimony "that anxiety caused her to faint, but accurately observed that Plaintiff did not treat her anxiety with medication or counseling." (ECF No. 14, PageID.1030.)

In her opinion, the ALJ wrote: "[s]he also testified that she experiences anxiety from her pain and her bills which caused issues with passing out." (ECF No. 9-2, PageID.66.) Here, without expressly using the term 'vasovagal syncope,' the ALJ is clearly referring to

---

[1] Vasovagal (or neurocardiogenic) syncope is fainting that occurs when the part of your nervous system that regulates heart rate and blood pressure malfunctions in response to a trigger, such heat exposure or emotional distress. *See* Mayo Clinic, *Vasovagal Syncope*, https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527 (visited Mar. 22, 2021).

the symptoms that Plaintiff suffers from the condition, including fainting when experiencing anxiety. The ALJ continued, "[s]he also stated she is not taking any medication for her anxiety nor is she going to counseling." (*Id.*) The ALJ did not find that Plaintiff's mental health was a severe condition, which Plaintiff does not dispute; the ALJ wrote that "[w]hile all of these conditions are non-severe, the undersigned considered all of the claimant's severe *and non-severe* impairments in determining the claimant's residual functional capacity, and appropriate exertional, postural, reach, environmental, and *mental limitations* have been included to address the claimant's severe and non-severe impairments." (ECF No. 9-2, PageID.64) (emphasis added.) Some of these limitations that appear to go to Plaintiff's potential to faint included: never climbing ladders, ropes, or scaffolds; must avoid exposure to unprotected heights, hazardous machinery, and must avoid balancing on narrow, slippery, or moving surfaces. (ECF No. 9-2, PageID.65.) Although the ALJ does not use the term 'vasovagal syncope,' she certainly acknowledges Plaintiff's fainting due to anxiety. Although it is true, as the ALJ writes, that Plaintiff testified she had not sought medication or counseling for the anxiety that caused her fainting, the ALJ nonetheless included several limitations in the RFC to address this physical limitation of Plaintiff's. I therefore suggest that any error in failing to specifically write 'vasovagal syncope' is harmless, and Plaintiff's argument does not undermine the ALJ's decision which was supported by substantial evidence. .

## H. Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 11), and **GRANTING** the Commissioner's motion, (ECF No. 14), and affirming the decision.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 23, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge